FILED
IN CLERK'S OFFICE

# IN THE UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF MASSACHUSETTS

**( 300 State Street,** Springfield, Massachusetts 01105   )

| | |
|---|---|
| Ronald Satish Emrit, | ) |
|     Plaintiff (Pro Se) | ) |
| | )   C. A. No._____ |
|     v. | ) |
| | ) |
| Federal Bureau of Investigation, | ) |
|     Defendant | ) |
| | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

COMES NOW, the plaintiff Ronald Satish Emrit, who is bringing forth this complaint against the sole governmental defendant for the causes of action amounting to the tortious invasion of privacy through intrusion upon seclusion and "false light" in addition to the intentional infliction of emotional distress amounting to extreme and outrageous conduct. In bringing forth this complaint, the plaintiff states, avers, and alleges the following:

## I.) NATURE OF THE CASE

1.) In addition to having committed the aforementioned tortious acts, the plaintiff also alleges that the sole governmental defendant has committed a violation of the Equal Protection Clause and Due Process Clause of the Fifth and Fourteenth Amendments in addition to the Privileges and Immunities Clause or "Comity Clause" of Article IV, Section 2, Clause 1 of the Constitution.

2.) The plaintiff alleges that the sole defendant should not be entitled to the Eleventh Amendment doctrine of sovereign immunity with regards to these causes of action specifically because no governmental defendant such as the FBI would waive its right to sovereign immunity in any jurisdiction.

3.) The plaintiff also argues that these causes of action are not barred by the Federal Tort Claims Act (FTCA), and that the sole governmental defendant has committed an inherent violation of Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990.

4.) Furthermore, the plaintiff alleges that the sole governmental defendant has violated the plaintiff's Fourth Amendment rights to reasonable expectation of privacy (see Katz v. UNited States), and that the exclusionary rule and fruit-of-the-poisonous-tree doctrine (notwithstanding the attenuation doctrine and rule of inevitable discovery) should be applied to any unlawful surveillance conducted by the sole governmental defendant specifically because said defendant has lacked any reasonable suspicion or probable cause with regards to conducting surveillance on the plaintiff dating back to at least 2001.

5.) Finally, the plaintiff argues that there should be the equitable remedy of an injunction imposed by the court mandating that the sole defendant provide an unredacted copy of the reports of its agents' surveillance conducted on the plaintiff (which may need to be de-classified and disclosed as part of a subpoena duces tecum in the discovery process) dating back to at least 2001.

## II.) PARTIES TO THIS LITIGATION

6.) The plaintiff is an indigent, disabled, and unemployed resident of the state of Nevada. His current mailing address is 6655 38th Lane East, Sarasota, FL 34243. His cell phone number is currently (703)936-3043 and his primary email address is einsteinrockstar2@outlook.com. The plaintiff is filing this cause of action in the

U.S. DIstrict Courts of Southern Florida, Middle Florida, and Northern Florida because of the fact that the plaintiff attended law school at Saint Thomas University School of Law in Miami Gardens, Florida and also took the bar exam at Ybor City in Tampa, Florida back in 2004 (which is administered by the Florida Board of Bar Examiners domiciled in Tallahassee, Florida in the Northern District of Florida).  The plaintiff also took the Multi-state Professional Responsibility Exam (MPRE) at the Broward Convention Center in Fort Lauderdale back in 2005 (i.e. Broward County, Florida).

7.) The sole defendant is the Federal Bureau of Investigation or FBI which is known as the most powerful law enforcement agency in the United States and perhaps the world and which is a political sub-division of the Cabinet-level agency known as the Department of Justice which also oversees other law enforcement agencies such as ATF, U.S. Marshals, and DEA.  The mailing address of the FBI is 935 Pennsylvania Ave NW, Washington, DC 20535 and their phone number is (202) 324-3000

## III.) JURISDICTION AND VENUE

8.) According to Federal Rules of Civil Procedure 8(a)(1), Plaintiff is required to provide "a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;"

9.) Because the court does not already have personal or subject matter jurisdiction over this issue, it is necessary to engage in a brief discussion of the court's jurisdiction so that the defendants can not move to dismiss this case based on procedural grounds involving a lack of proper jurisdiction.

10.) Pursuant to 28 U.S.C.A. Section 1332, the U.S. District Court for the District of Massachusetts (as an Article III court) has jurisdiction over this matter because there is complete diversity of jurisdiction between the Plaintiff and the sole defendant.

11.) As an Article III court, the U.S. District Court for the District of Massachusetts also has subject matter jurisdiction over the present case at bar because this proceeding involves a discussion of Title VII of the Civil Rights Act of 1964, Americans with Disabilities Act of 1990, Equal Protection Clause, Due Process Clause, Fourth Amendment, and Privileges and Immunities Clause.

12.) Therefore, a federal question is presented by the implication of the black-letter law of the aforementioned federal statutes in addition to the discussion of Constitutional Law provisions.

13.) Venue in this jurisdiction is also proper pursuant to 28 U.S.C.A. Sections 1391 and 1400.

14.) Because the amount in controversy exceeds $75,000 (i.e. $80,000 is greater than $75.000), this court also has jurisdiction with regards to that particular issue.

## IV.) STATEMENT OF FACTS

15.) The plaintiff started law school in the fall of 1999 as he began to attend SAint Thomas University School of Law

16.) In August of 1999, the plaintiff traveled to Santiago de Cuba to visit his penpal and fiance Rachel Barreiro Garcia who was then a medical student from Las Tunas, Cuba.

17.) The plaintiff visited Santiago de Cuba with his friend Damon Ford of Silver Spring, Maryland (who attended Paint Branch High School) and the plaintiff attended Gonzaga College High School with the former Vice President Dan Quayle's sons Tucker and Ben Quayle.

18.) The plaintiff and Damon Ford visited Santiago de Cuba and Damon Ford became the romantic love interest of Rachel Garcia's best friend, i.e. Marena Linares, who is now some kind of dental assistant in Tenerife in the Canary Islands off of the coast of Spain nearby to the Mediterranean Sea.

4

19.) The plaintiff purchased the tickets from a travel agency "doing business as" (d/b/a) Mundaca Travel based in Qintana Roo of Mexico by the Yucatan Peninsula and Cancun, Mexico (the airline tickets and travel arrangements were sent through Federal Express to either the plaintiff's house in Silver Spring, Maryland or the plaintiff's workplace in Wheaton, Maryland).

20.) The plaintiff traveled through Delta Airlines from the Washington, D.C. area to Atlanta, Georgia and then on to Cancun, Mexico and the plaintiff and his friend flew by way of Cubana Airlines from Cancun, Mexico to Havana, Cuba and then from Havana, Cuba to Santiago de Cuba.

21.) The plaintiff and his friend then traveled from Cancun, Mexico to Havana, Cuba (La Habana), and then on to Santiago de Cuba where the plaintiff and his friend stayed at the Casa Granda Hotel in Santiago de Cuba.

22.) While there is something called the Helms-Burton Act and Trading-with-the-Enemy Act, it has always been a practice of Americans to travel to Cuba through third countries because there are no direct flights from the United States without first obtaining a license to travel to Cuba from the Office of Foreign Assets Control (OFAC) under the United States Department of Treasury.

23.) Pursuant to Rule 201 of the Federal Rules of Evidence (FRE), the plaintiff argues that the court should take judicial notice that the plaintiff believes that nobody has ever been arrested or imprisoned for violating the Helms-Burton Act by traveling to Cua through third countries (like Mexico) although many people might have been fined by U.S. Customs, Immigration and Naturalization Services or INS under Department of Justice (which is presumabky now the U.S. Citizenship and Immigration Services or CIS under U.S. Department of Homeland

Security started by President George W. Bush), and/or Office of Foreign Assets Control (OFAC) under the U.S. Department of Treasury.

24.) Pursuant to Rule 201 of the Federal Rules of Evidence (FRE), the plaintiff also asserts that the court should take judicial notice that the Cuban customs officers often did not stamp the passports of Americans traveling through third countries because they wanted to encourage American travelers to visit Cuba and bring American dollars into a country which seemingly wanted to embrace capitalism and/or laissez-faire economics even though President Richard Nixon took the American dollar off of the gold standard during his administration (notwithstanding the vast amounts of gold stored at Fort Knox in Kentucky and the Federal Reserve in Manhattan in New York).

25.) In 2001, the plaintiff was in a Professional Responsibility class at Saint Thomas University School of Law when the plaintiff challenged one of his professors (i.e. Professor Daniel Gordon) and invoked the Socratic Method to ask the question, "Should Lawyers Learn Ebonics?"

26.) In 2001, the plaintiff also emailed a marriage proposal to his ex-girlfriend in which the plaintiff was making fun of himself and his paranoia of opening letters during 2001, and the plaintiff believes in "good faith" that his ex-girlfriend Erika Davida Viltz may have misunderstood the emailed marriage proposal.

27.) Pursuant to Rule 201 of the Federal Rules of Evidence (FRE), the plaintiff argues that the court should also take judicial notice that the plaintiff worked as a laboratory technician in somewhat of an apprenticeship or internship at the National Institutes of Health (NIH) in Rockville, Maryland in the summer of 1996 (July of that year).

28.) To be more specific, the plaintiff worked at Building 10 or the Clinical Center under the supervision of Dr. Cynthia Dunbar and Dr. John Tisdale (from South Carolina) at NIH/NHLBI/Division of Hematology whereby NHLBI is an acronym for National Heart, Lung, and Blood Institute.

29.) Previously that summer (in 1996), the plaintiff had worked for Ms. Betsy Singer at Building 31A on NIH campus at NIH/NIDDK/OHRR whereby NIDDK is an acronym for National Institute of Digestive, Diabetes, and Kidney Disorders and operates as a clearinghouse of information to the general public by sending out brochures and/or pamphlets related to disorders such as Crohn's Disease, diabetes mellitus (involving the islets of Langerhans in the pancreas), ulcerative collitis, Hepatitis C, etc..

30.) The previous year, the plaintiff had worked for Dr. Patrice Desvigne-Nickens at NIH/NHLBI/DHVD whereby DHVD is an acronym for Division of Heart and Vascular Diseases and the office location was off of Rockledge Drive in either Rockville or Bethesda, Maryland. In the summer of 1994, the plaintiff had worked for branch chief Dr. Peter Spooner at NIH/NHLBI/DHVD and the late Dr. Spooner later went on to work at Johns Hopkins Medical School.

31.) While the plaintiff was a laboratory technician/intern at NIH/NHLBI/Division of Hematology, he would often run samples through an Avidin Column, autoclave samples, perform optical density (OD) spectrophotometry, perform Polymerase Chain Reactions (PCR's), extract DNA using a Qiagen kit, and perform Polyacrylamide Gel Electrophoreses or PAGE gels (all under the supervision of Dr. John Tisdale in that laboratory).

32.) The court can take judicial notice that Dr. John Tisdale (under the supervision of his boss Dr. Cynthia Dunbar) was working with the progenitors of spleen cells and he and I would often work together to change the cell media of the spleen cells

7

as they were either refrigerated or frozen (the plaintiff can not specifically remember if they were refrigerated and/or frozen and evidence in the form of "past recollection recorded" is not necessary with regards to this specific fact because it is not a "material fact" to the present case at bar.

33.) The plaintiff had also won 2nd place in the Washington, D.C. science fair in the early 1990's in the category of Biochemistry as he worked as an apprentice or intern to Dr. Winslow Seale at Children's Hospital in Washington, D.C. (Dr. Seale has since changed his name to a Muslim name which the plaintiff believes is "Ehum Johare" and the plaintiff remembers that Dr. Seale mentioned something about going on a Mecca to Saudi Arabia.

34.) With regards to the science fair in Washington, D.C., the plaintiff was working on the subject matter of evaluating the ratios of the phospholipids lecithin to sphingomyelin (i.e. also referred to as L/S Ratio) in the tracheal aspirates of the neonatal surfactant of neonates with Respiratory Distress Syndrome (RDS).

35.) The plaintiff remembers that he and Dr. Winslow Seale would often isolate and separate the phospholipids from each other using a complicated machine associated with High Performance Liquid Chromotography (HPLC).

36.) Pursuant to Rule 201 of the Federal Rules of Evidence (FRE), the court should also take judicial notice that the plaintiff also worked as an apprentice or intern to a Dr. Srevalsen (spelling of the last name may be inaccurate) at Georgetown University Hospital in the early 1990's.

37.) Dr. Srevalsen was a Hindu doctor, and he was working with oncogenes (genes associated with cancer cells) in a line of mouse fibroblast cells whereby the plaintiff would often count cells on a hemocytometer.

38.) With regards to curing cancer, the plaintiff believes that the following topics are both conditionally and logically relevant to this subject matter: restriction endonucleases, reverse transcriptase, frameshift mutations, plasmids, recombinant DNA technology, retroviruses, angiogenesis, metastasis, Tobacco Mosaic Virus (TMV), and Tumor Necrosis Factor (TNF).

39.) The court can also take judicial notice that the plaintiff worked at a separate NIH office under Kelly Prevost in 1998 (he was sent as a temporary employee by his mother's temporary agency "doing business as" Karen Smith Temps, Incorporated (KST) and/or The Smith Group, Inc..

40.) Furthermore, in 2004, the plaintiff was sent as a temporary employee by his mother's temporary agency to the Budget Office of National Cancer Institute (NCI) under its chief Jim Dickens and in 2004, the plaintiff had also been sent as a temporary employee by The Smith Group, Inc. and worked with is brother-in-law Daryl Brooks at the NICHD grants office in Rockville, Maryland whereby the plaintiff would often handle Final Invention Statements (FIS) and Final Progress Reports of scientists who had applied for grants with NICHD under NIH.

41.) To be more specific, NICHD is an acronym for "National Institute of Child Health and Human Development."

42.) The plaintiff and his brother-in-law Daryl Brooks had also represented The Smith Group, Inc. during a bidding proposal or sub-contracting event in Rockville, Maryland at the Food and Drug Administration (FDA) which is also under the Department of Health and Human Services (HHS) with the NIH and Centers for Disease Control (CDC) domiciled in Atlanta, Georgia where the plaintiff attended Morehouse College for a semester in 1996 and took courses in Cell Biology,

Molecular Genetics, Epidemiology, and Inorganic Chemistry (the plaintiff lived in a house on 972 Oak Street off of Abernathy Road in SW Atlanta, Georgia).

43.) The plaintiff filed an articles of incorporation in 2013 for a company "doing business as" d/b/a Alex Garcia Enterprises, Inc. in the offices of Rhode Island Secretary of State A. Ralph Mollis and later filled out a PHS 398 or grant proposal with the Office of Scientific Research at NIH even though Alex Garcia Enterprises, Inc. was intended to be a start-up record label.

44.) Although the doctrine of ultra vires transactions has been abolished in most jurisdictions by the Revised Model Business Code Annotated (RMBCA), the plaintiff believes in "good faith" that as an incorporator and promoter of AGE (acronym for Alex Garcia Enterprises, Inc.), he had the actual, apparent, express, and implied authority to bind AGE to contract and/or quasi-contract with a governmental agency such as NIH notwithstanding the fact that the plaintiff was trying to change the potential business arena of AGE from that of a start-up record label to one that could potentially get involved with health-related business matters.

45.) Because of the fact that neither AGE nor International Christian Nativity, Inc. (ICN) never received a grant from NIH or HHS and never even received a reply from NIH after filing PHS 398, it is a reasonable proposition to assert that neither the plaintiff, AGE, or ICN had to fill out any paperwork with the Maryland Department of Labor, Licensing, and Regulation (DLLR) and/or any similar offices in the states of Rhode ISland, Arkansas, or Florida.

46.) The court can take judicial notice that International Christian Nativity, Inc. was started after the plaintiff filed an articles of organization in 2003 in the office of Arkansas Secretary of State Charlie Daniels and that Alex Garcia Enterprises, Inc. had also been a business entity around 2001 in the state of Florida after the

plaintiff filed the necessary paperwork with the Florida Secretary of State at http://www.sunbiz.org to have AGE treated as a fictitious entity in which the articles of incorporation specified that the company would attempt to retail women's lingerie upon buying said lingerie in a wholesale capacity from venders such as Victoria's Secret and Frederick's of Hollywood.

47.) The court can take judicial notice that the current status of Alex Garcia Enterprises, Inc. is that its corporate charter was revoked on April 1st, 2016 by the Rhode Island Secretary of State and the indigent, disabled, and unemployed plaintiff is trying to obtain a "Letter of Good Standing" or LOGS from the Rhode Island Division of Taxation which would cost the plaintiff $50.00.

48.) While the plaintiff is currently disabled and unemployed, he has made several failed attempts to return back to the workforce which is encouraged by the Social Security Administration (SSA) which encourages disabled Americans to engage in part-time employment while receiving disability benefits.

49.) More specifically, the court can take judicial notice that the plaintiff has been diagnosed in 2004 with bipolar disorder and schizoaffective disorder by his psychiatrist Dr. Dida Ganjoo who had worked in Bowie, Maryland at the time and has worked at several hospitals in the Washington, D.C. area.

50.) Nevertheless, the plaintiff believes that he was placed on an "FBI watch list" on or around late 2001 because his phenotype looks like a Middle Easterner or Arab and also because his law school may have reported to the police or FBI that the plaintiff had erratic behavior while questioning his Professional Responsibility professor and emailing a misunderstood marriage proposal to his ex-girlfriend Erika Viltz while she was supposedly in New York.

51.) The plaintiff also believes that he was profiled as a "person of interest" (like U.S. Army Scientist Steven Hatfill) because of the fact that he had previously worked with DNA as a laboratory technician at NIH/NHLBI/Division of Hematology and also because the FBI may have been conducting surveillance on the plaintiff simply because he was mailing a lot of letters to his fiance Rachel Garcia from Las Tunas, Cuba, and the U.S. Postal Inspector and FBI may have thought that they had reasonable suspicion or probable cause to launch a counterintelligence or COINTELPRO investigation or perhaps obtain a FISA warrant for anybody who had sent letters to Cuba given that Cuba has been considered a Communist enemy of the United States since the Cold War, the failed "Bay of Pigs" invasion, and the negotiations between Nikita Khruschev and President John F. Kennedy regarding the Cuban Missile Crisis at the height of the Cold War.

52.) Once the FBI would have discovered that the plaintiff is and was a Catholic African-American from Washington, D.C. (of a mixed background), the law enforcement agency should have permanently suspended any surveillance of the plaintiff with regards to racially-profiling the plaintiff as a Middle Easterner and/or Arab.

53.) Furthermore, simply working as a lab technician for NIH and having a Cuban fiance would not give the FBI reasonable suspicion and/or probable cause to conduct counter-intelligence surveillance on the plaintiff (COINTELPRO) and/or profile the plaintiff as a "person of interest" in the same investigation with which U.S. Army Scientist Steven Hatfill was involved.

54.) As a result, this harassment lawsuit against the FBI (alleging that the law enforcement agency has committed a Civil Rights violation against the plaintiff in a form of "racial profiling") is subtantially similar to the harassment lawsuit filed

against FBI presumably by the U.S. Army SCientist Dr. Steven Hatfill, although the plaintiff in the present case at bar is seeking damages for far less with regards to pecuniary damages, harm to reputation, loss of consortium, and/or loss of wages.

55.) However, the plaintiff is seeking the equitable remedy of an injunction mandating that the powerful law enforcement agency be required to stop conducting surveillance and/or COINTELPRO or issuing FISA warrants against the plaintiff simply because he had a Cuban fiance in the past who in 1999 was a medical student from Las Tunas, Cuba (she supposedly has moved to Barcelona, Spain).

56.) The court can take judicial notice that Rachel Garcia wrote letters telling the plaintiff around 1998 that he could have sent her a "carta de invitacion" and the Ministry of Foreign Affairs in Cuba could have allowed Rachel Garcia to travel to the United States and perhaps become a "legal permanent resident" pursuant to the Cuban Adjustment Act, Toricelli Act specifically because of the fact that the plaintiff is considered to be an American citizen pursuant to the concepts of jus soli (citizenship by being born in Boston, Massachusetts) and jus sanguinis (citizenship because the plaintiff's mother was born in the United States).

57.) While the plaintiff's father is an East Indian from Trinidad and Tobago, he had become an American citizen by being sponsored by Billy Jackson of Massachusetts, and has also worked for the Nuclear Regulatory Commission or NRC in Rockville, Maryland and United States Department of Agriculture (USDA).

58.) The plaintiff can take judicial notice that the plaintiff's father also had a security clearance with the NRC. The plaintiff filled out a security clearance application to be a paralegal with the U.S. Department of Energy (with Alan

13

Speicher of Continuum Legal in McLean or Tysons Corner, Virginia) but the plaintiff had an incomplete security clearance application due to the fact that his ex-wife of Sabine Aisha Jules (from Haiti) did not want to provide the plaintiff with her Social Security Number (SSN) which was required on the paralegal security clearance application with the U.S. Department of Energy.

59.) The court can also take judicial notice that the plaintiff in the present case at bar was a Democratic presidential candidate in 2016, he is a Democratic presidential candidate in 2020, and he intends on being a Democratic presidential candidate again in 2024.

60.) More specifically, in the 2016 presidential election, the plaintiff's candidate ID number was P60005535 (registered with FEC Form 2 with the Federal Election Commission (FEC) at 999 E Street, NW

Washington, DC 20463)

61.) In addition, with regards to the Political Action Committee (PAC) or Separate Segregated Fund (SSF) representing the plaintiff, the principal campaign committee identification number was C00569897.

62.) Accordingly, the plaintiff was not represented by any "Super PAC" and was not funded by any philanthropists or lobbyists such as the infamous Koch Brothers which are allowed to donate as much as they want to any PAC or Super PAC according to the stare decisis/persuasive precedent of *Citizens United v. FEC, 558 U.S. 310 (2010)*.

63.) Upon filling out FEC Form 1, it can be shown that the plaintiff as a candidate, nor his PAC/SSF had any contributions from anybody as he never was able to

receive donations or funding from any person, entity, corporation, or non-profit entity.

64.) Finally, the plaintiff would like to articulate for the court that he had conversations with FBI Special Agent or employee Andrea Kalucci of North Miami Beach field office and also with FBI Special Agent or employee Kal Wong of the FBI field office in Honolulu, Hawaii.

65.) While the plaintiff had applied for a position as intelligence analyst or perhaps Special Agent with the FBI, he was never officially offered any position of employment with FBI due to the fact that these employment positions are considered to be very competitive.

66.) Furthermore, around the latter part of 2003, the plaintiff had a conversation with "Faye" from CIA on his way to a Barbri bar review course in Washington, D.C.. The conversation was with regards to the plaintiff's application to be a clandestine agent with CIA.

67.) Needless to say, the court can also take judicial notice that he was never offered a position of employee with CIA although the plaintiff believes in "good faith" that he is an "intelligence subject" of CIA or another intelligence agency and the plaintiff does not mind or is not offended by the possibility or prospect of being an "intelligence subject."

68.) On or around 2005, the plaintiff received a letter from FBI signed by "Timothy Singer" which made a reference to "military operational medicine" and also received a letter from the office of President George W. Bush signed by "Heidi Marquez-Smith" making a reference to nanotechnology.

69.) The plaintiff has taken many medications for bipolar disorder in the past including but not limited to seroquel (quetiapine fumarate), lithium carbonate,

depakote (divalproex), zyprexa, risperdal (the subject of a class action lawsuit because of incidences of gynecomastia in males), Abilify, Geodon, Wellbutrin, Gabapentin/neurontin, Trileptal, Clonazepam (Klonopin), Buspar, Lamictal, Prolixin, Haldol (which has caused the incidence of akithisia in the plaintiff requiring benadryl and cogentin to offset these effects at Univetsity of Iowa Hospital in 2018), etc..

70.) In concluding the list of conditionally and logically relevant facts, the plaintiff would like to articulate to the court that he applied online for positions of employment with FBI, CIA, and NSA at Jacaranda Library in Venice, Florida on or around the latter part of 2009.

## V.) COUNT ONE: VIOLATION OF THE EQUAL PROTECTION CLAUSE INHERENT FROM THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

71.) Because of the fact that the plaintiff is African-American, it can be stated with substantial certainty that he is a member of a suspect classification of discrete and insular minorities which have suffered invidious discrimination within the context of American jurisprudence.

72.) As such, any federal, state, or local laws/regulations (restricting the plaintiff from being on the ballot in this particular state for the primary and general election (assuming that the FBI plays a large role in monitoring the election process in 2020 and beyond) and profiling the plaintiff as an Arab, Middle Easterner, or Muslim) must pass a strict scrutiny test as opposed to an intermediate scrutiny test or rational basis test.

73.) More specifically, the burden of proof and persuasion rests squarely with the sole defendant FBI to show by a preponderance of the evidence that any federal, state, or local laws (restricting the plaintiff from being placed on the primary and general election ballot in this state (and assuming the FBI plays a large role in monitoring the elections process in 2020 and beyond) and racially-profiling the plaintiff as an Arab, Middle Easterner, or Muslim) applying to the plaintiff must be "narrowly-tailored to a compelling government objective." (rather than the lower level of being "rationally-related to a legitimate government objective in which the burden of proof and persuasion rests squarely with the plaintiff).

74.) The plaintiff argues that the sole defendant FBI violated his Equal Protection Rights inherent from the Fifth and Fourteenth Amendments to the Constitution by racially profiling the plaintiff as an Arab, Middle Easterner, or Muslim around 2001 when the plaintiff is a Catholic, African-American from the Washington, D.C. area. Furthermore, it would also be an Equal Protection violation to subject the plaintiff to counterintelligence or COINTELPRO or get a FISA warrant simply because the plaintiff had a Cuban fiance in 1999 named Rachel Garcia or to consider the plaintiff to be a "person of interest" in the same investigation involving Steven Hatfill's harassment lawsuit against the FBI when the plaintiff was merely an apprentice or intern at NIH/NHLBI/DHVD working under the supervision of Dr. Cynthia Dunbar and Dr. John Tisdale. The court can take judicial notice that the plaintiff does not mind or is not offended by the possible prospect of being an "intelligence subject" to at least one American intelligence agency such as CIA, DIA, NSA, or NRO. The court can also take judicial notice

that the plaintiff can not prove with substantial certainty or by a preponderance of the evidence that he is in fact an "intelligence subject" as such a burden of proof and/or persuasion would be almost insurmountable whereby a scintilla of evidence would seem to be sufficient and/or clear and convincing evidence if not evidence beyond a reasonable doubt.

## VI.) COUNT TWO: VIOLATION OF THE DUE PROCESS CLAUSE INHERENT FROM THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

75.) Because of the fact that the plaintiff is African-American, it can be stated with substantial certainty that he is a member of a suspect classification of discrete and insular minorities which have suffered invidious discrimination within the context of American jurisprudence.

76.) As such, any federal, state, or local laws/regulations (restricting the plaintiff from being on the ballot in this particular state for the primary and general election (assuming that the FBI plays a large role in monitoring the election process in 2020 and beyond) and profiling the plaintiff as an Arab, Middle Easterner, or Muslim) must pass a strict scrutiny test as opposed to an intermediate scrutiny test or rational basis test.

77.) More specifically, the burden of proof and persuasion rests squarely with the sole defendant FBI to show by a preponderance of the evidence that any federal, state, or local laws (restricting the plaintiff from being placed on the primary and

general election ballot in this state (and assuming the FBI plays a large role in monitoring the elections process in 2020 and beyond) and racially-profiling the plaintiff as an Arab, Middle Easterner, or Muslim) applying to the plaintiff must be "narrowly-tailored to a compelling government objective." (rather than the lower level of being "rationally-related to a legitimate government objective in which the burden of proof and persuasion rests squarely with the plaintiff).

78.) The plaintiff argues that the sole defendant FBI violated his procedural and substantive due process rights inherent from the Fifth and Fourteenth Amendments to the Constitution by racially profiling the plaintiff as an Arab, Middle Easterner, or Muslim around 2001 when the plaintiff is a Catholic, African-American from the Washington, D.C. area. Furthermore, it would also be a Due Process Clause violation to subject the plaintiff to counterintelligence or COINTELPRO or get a FISA warrant simply because the plaintiff had a Cuban fiance in 1999 named Rachel Garcia or to consider the plaintiff to be a "person of interest" in the same investigation involving Steven Hatfill's harassment lawsuit against the FBI when the plaintiff was merely an apprentice or intern at NIH/NHLBI/DHVD working under the supervision of Dr. Cynthia Dunbar and Dr. John Tisdale. The court can take judicial notice that the plaintiff does not mind or is not offended by the possible prospect of being an "intelligence subject" to at least one American intelligence agency such as CIA, DIA, NSA, or NRO. The court can also take judicial notice that the plaintiff can not prove with substantial certainty or by a preponderance of the evidence that he is in fact an "intelligence subject" as such a burden of proof and/or persuasion would be almost insurmountable whereby a

scintilla of evidence would seem to be sufficient and/or clear and convincing evidence if not evidence beyond a reasonable doubt.

## VII.) COUNT THREE: VIOLATION OF THE PRIVILEGES AND IMMUNITIES CLAUSE OF ARTICLE IV, SECTION 2, CLAUSE 1 OF THE U.S. CONSTITUTION

79.) Because of the fact that the plaintiff is African-American, it can be stated with substantial certainty that he is a member of a suspect classification of discrete and insular minorities which have suffered invidious discrimination within the context of American jurisprudence.

80.) As such, any federal, state, or local laws/regulations (restricting the plaintiff from being on the ballot in this particular state for the primary and general election (assuming that the FBI plays a large role in monitoring the election process in 2020 and beyond) and profiling the plaintiff as an Arab, Middle Easterner, or Muslim) must pass a strict scrutiny test as opposed to an intermediate scrutiny test or rational basis test.

81.) More specifically, the burden of proof and persuasion rests squarely with the sole defendant FBI to show by a preponderance of the evidence that any federal, state, or local laws (restricting the plaintiff from being placed on the primary and general election ballot in this state (and assuming the FBI plays a large role in monitoring the elections process in 2020 and beyond) and racially-profiling the plaintiff as an Arab, Middle Easterner, or Muslim) applying to the plaintiff must be

"narrowly-tailored to a compelling government objective." (rather than the lower level of being "rationally-related to a legitimate government objective in which the burden of proof and persuasion rests squarely with the plaintiff).

82.) The plaintiff argues that the sole defendant FBI violated his rights inherent from the Privileges and Immunities Clause of the Constitution (i.e. the Comity Clause or Article IV, Section 2, Clause 1) by racially profiling the plaintiff as an Arab, Middle Easterner, or Muslim around 2001 when the plaintiff is a Catholic, African-American from the Washington, D.C. area. Furthermore, it would also be a violation of the Privileges and Immunities Clause to subject the plaintiff to counterintelligence or COINTELPRO or get a FISA warrant simply because the plaintiff had a Cuban fiance in 1999 named Rachel Garcia or to consider the plaintiff to be a "person of interest" in the same investigation involving Steven Hatfill's harassment lawsuit against the FBI when the plaintiff was merely an apprentice or intern at NIH/NHLBI/DHVD working under the supervision of Dr. Cynthia Dunbar and Dr. John Tisdale. The court can take judicial notice that the plaintiff does not mind or is not offended by the possible prospect of being an "intelligence subject" to at least one American intelligence agency such as CIA, DIA, NSA, or NRO. The court can also take judicial notice that the plaintiff can not prove with substantial certainty or by a preponderance of the evidence that he is in fact an "intelligence subject" as such a burden of proof and/or persuasion would be almost insurmountable whereby a scintilla of evidence would seem to be

sufficient and/or clear and convincing evidence if not evidence beyond a reasonable doubt,

## VIII.) COUNT FOUR: VIOLATION OF 42 U.S.C. SECTION 1983

83.) According to Cornell Law School and The Legal Information Institute, 42 U.S.C. Section 1983 provides in pertinent part that, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

84.) The plaintiff argues that the sole defendant FBI violated 42 U.S.C. Section 1983 by racially profiling the plaintiff as an Arab, Middle Easterner, or Muslim around 2001 when the plaintiff is a Catholic, African-American from the Washington, D.C. area. Furthermore, it would also be a violation of 42 U.S.C. Section 1983 to subject the plaintiff to counterintelligence or COINTELPRO or get a FISA warrant simply because the plaintiff had a Cuban fiance in 1999 named

Rachel Garcia or to consider the plaintiff to be a "person of interest" in the same investigation involving Steven Hatfill's harassment lawsuit against the FBI when the plaintiff was merely an apprentice or intern at NIH/NHLBI/DHVD working under the supervision of Dr. Cynthia Dunbar and Dr. John Tisdale. The court can take judicial notice that the plaintiff does not mind or is not offended by the possible prospect of being an "intelligence subject" to at least one American intelligence agency such as CIA, DIA, NSA, or NRO. The court can also take judicial notice that the plaintiff can not prove with substantial certainty or by a preponderance of the evidence that he is in fact an "intelligence subject" as such a burden of proof and/or persuasion would be almost insurmountable whereby a scintilla of evidence would seem to be sufficient and/or clear and convincing evidence if not evidence beyond a reasonable doubt,

## IX.) COUNT FIVE: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

85.) According to the website operated by the American Association of University Women (AAUW), "Title VII of the Civil Rights Act of 1964 is a federal law that prohibits employers from discriminating against employees on the basis of sex, race, color, national origin, and religion. It generally applies to employers with 15 or more employees, including federal, state, and local governments. Title VII also applies to private and public colleges and universities, employment agencies, and labor organizations."

86.) The plaintiff argues that the sole defendant FBI violated Title VII of the Civil
Rights Act of 1964 by racially profiling the plaintiff as an Arab, Middle Easterner,
or Muslim around 2001 when the plaintiff is a Catholic, African-American from
the Washington, D.C. area. Furthermore, it would also be a violation of Title VII
of the Civil Rights Act of 1964 to subject the plaintiff to counterintelligence or
COINTELPRO or get a FISA warrant simply because the plaintiff had a Cuban
fiance in 1999 named Rachel Garcia or to consider the plaintiff to be a "person of
interest" in the same investigation involving Steven Hatfill's harassment lawsuit
against the FBI when the plaintiff was merely an apprentice or intern at
NIH/NHLBI/DHVD working under the supervision of Dr. Cynthia Dunbar and Dr.
John Tisdale. The court can take judicial notice that the plaintiff does not mind or
is not offended by the possible prospect of being an "intelligence subject" to at
least one American intelligence agency such as CIA, DIA, NSA, or NRO. The
court can also take judicial notice that the plaintiff can not prove with substantial
certainty or by a preponderance of the evidence that he is in fact an "intelligence
subject" as such a burden of proof and/or persuasion would be almost
insurmountable whereby a scintilla of evidence would seem to be sufficient and/or
clear and convincing evidence if not evidence beyond a reasonable doubt,

## X.) COUNT SIX: VIOLATION OF THE AMERICANS WITH

## DISABILITIES ACT OF 1990 (ADA)

87.) According to the website ADA.gov, "The Americans with Disabilities Act
(ADA) was signed into law on July 26, 1990, by President George H.W. Bush. The

ADA is one of America's most comprehensive pieces of civil rights legislation that prohibits discrimination and guarantees that people with disabilities have the same opportunities as everyone else to participate in the mainstream of American life -- to enjoy employment opportunities, to purchase goods and services, and to participate in State and local government programs and services. Modeled after the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, religion, sex, or national origin – and Section 504 of the Rehabilitation Act of 1973 -- the ADA is an "equal opportunity" law for people with disabilities. To be protected by the ADA, one must have a disability, which is defined by the ADA as a physical or mental impairment that substantially limits one or more major life activities, a person who has a history or record of such an impairment, or a person who is perceived by others as having such an impairment. The ADA does not specifically name all of the impairments that are covered."

88.) In the present case at bar, the plaintiff argues that the sole defendant FBI is a "covered entity" within the context of potential defendants that have violated the ADA of 1990 by discriminating against disabled persons.

89.) Because of the fact that the plaintiff has suffered and continues to suffer from bipolar disorder, schizoaffective disorder, obsessive compulsive disorder, and post-traumatic stress disorder (PTSD), it is asserted with substantial certainty that the plaintiff is disabled and therefore covered by the ADA of 1990.

90.) More specifically, the plaintiff has been determined to be disabled by Dornita McKinnon of the state of Maryland as well as the Social Security Administration

25

(SSA) which continues to pay the plaintiff monthly benefits in the amount of $789.00 (with Medicare/Medicaid and Humana giving him medical insurance).

91.) The plaintiff argues that the sole defendant FBI violated the Americans with Disabilities Act of 1990 by racially profiling the plaintiff as an Arab, Middle Easterner, or Muslim around 2001 when the plaintiff is a Catholic, African-American from the Washington, D.C. area. Furthermore, it would also be a violation of the Americans with Disabilities Act of 1990 to subject the plaintiff to counterintelligence or COINTELPRO or get a FISA warrant simply because the plaintiff had a Cuban fiance in 1999 named Rachel Garcia or to consider the plaintiff to be a "person of interest" in the same investigation involving Steven Hatfill's harassment lawsuit against the FBI when the plaintiff was merely an apprentice or intern at NIH/NHLBI/DHVD working under the supervision of Dr. Cynthia Dunbar and Dr. John Tisdale. The court can take judicial notice that the plaintiff does not mind or is not offended by the possible prospect of being an "intelligence subject" to at least one American intelligence agency such as CIA, DIA, NSA, or NRO. The court can also take judicial notice that the plaintiff can not prove with substantial certainty or by a preponderance of the evidence that he is in fact an "intelligence subject" as such a burden of proof and/or persuasion would be almost insurmountable whereby a scintilla of evidence would seem to be sufficient and/or clear and convincing evidence if not evidence beyond a reasonable doubt,

## XI.) COUNT SEVEN: NEGLIGENCE

92.) In order to prove a prima facie case for negligence, the following elements must be proved:

i.) A duty on the part of the defendant to conform to a specific standard of conduct for protection of the plaintiff against an unreasonable risk of injury;

ii.) A breach of that duty by the defendant;

iii.) The breach is the actual and proximate cause of the plaintiff's injury; and

iv.) Damage

93.) The plaintiff argues that the sole defendant FBI was negligent by racially profiling the plaintiff as an Arab, Middle Easterner, or Muslim around 2001 when the plaintiff is a Catholic, African-American from the Washington, D.C. area. Furthermore, it would also be negligent of the FBI to subject the plaintiff to counterintelligence or COINTELPRO or get a FISA warrant simply because the plaintiff had a Cuban fiance in 1999 named Rachel Garcia or to consider the plaintiff to be a "person of interest" in the same investigation involving Steven Hatfill's harassment lawsuit against the FBI when the plaintiff was merely an apprentice or intern at NIH/NHLBI/DHVD working under the supervision of Dr. Cynthia Dunbar and Dr. John Tisdale. The court can take judicial notice that the plaintiff does not mind or is not offended by the possible prospect of being an "intelligence subject" to at least one American intelligence agency such as CIA,

DIA, NSA, or NRO.  The court can also take judicial notice that the plaintiff can not prove with substantial certainty or by a preponderance of the evidence that he is in fact an "intelligence subject" as such a burden of proof and/or persuasion would be almost insurmountable whereby a scintilla of evidence would seem to be sufficient and/or clear and convincing evidence if not evidence beyond a reasonable doubt,

## XII.) COUNT EIGHT: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

94.) To prove the elements of intentional infliction of emotional distress in Florida, a plaintiff must prove the following five elements:

a.) the wrongdoer's conduct was intentional or reckless,that is, he intended his behavior when he knew or should have known that emotional distress would likely result;

b.) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community;

(c.) the conduct caused emotional distress; and

(d.) the emotional distress was severe.

95.) The relevant common law or case-law (invoking stare decisis and persuasive precedent) is according to ***Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949 (Fla. 3d DCA 2017)**.

96.) The court of course has constructive notice that if even only one element is not proven by the plaintiff, or if even one element is disproven by the defendant, it may be reversible error for the court to rule in the plaintiff's favor. All four elements must be shown to prove that the intentional infliction of emotional distress has occurred.

97.) The plaintiff argues that the sole defendant FBI committed the intentional infliction of emotional distress (IIED) by racially profiling the plaintiff as an Arab, Middle Easterner, or Muslim around 2001 when the plaintiff is a Catholic, African-American from the Washington, D.C. area. Furthermore, it would also be considered the intentional infliction of emotional distress (IIED) to subject the plaintiff to counterintelligence or COINTELPRO or get a FISA warrant simply because the plaintiff had a Cuban fiance in 1999 named Rachel Garcia or to consider the plaintiff to be a "person of interest" in the same investigation involving Steven Hatfill's harassment lawsuit against the FBI when the plaintiff was merely an apprentice or intern at NIH/NHLBI/DHVD working under the supervision of Dr. Cynthia Dunbar and Dr. John Tisdale. The court can take

judicial notice that the plaintiff does not mind or is not offended by the possible

prospect of being an "intelligence subject" to at least one American intelligence

agency such as CIA, DIA, NSA, or NRO. The court can also take judicial notice

that the plaintiff can not prove with substantial certainty or by a preponderance of

the evidence that he is in fact an "intelligence subject" as such a burden of proof

and/or persuasion would be almost insurmountable whereby a scintilla of evidence

would seem to be sufficient and/or clear and convincing evidence if not evidence

beyond a reasonable doubt,

# XIII.) COUNT NINE: TORTIOUS INVASION OF PRIVACY THROUGH INTRUSION UPON SECLUSION AND "FALSE LIGHT"

98.) Intrusion, or intrusion upon seclusion, is a type of invasion of privacy that involves interference with the solitude or seclusion of another.

99.) But simply intruding on the privacy of someone isn't enough to make a person liable for intrusion: the law requires the person filing an intrusion lawsuit to prove that the intrusion happened in a certain way.

100.) Laws governing intrusion can vary from state to state. However, in most states a plaintiff (the person filing a lawsuit) must prove that all of the following occurred:

- The defendant (the person being sued) intentionally invaded the plaintiff's privacy.

- The intrusion would be highly offensive to a reasonable person.
- The intrusion was on a private matter of the plaintiff's.
- The intrusion caused the plaintiff emotional anguish or suffering.

101.) The plaintiff argues that the sole defendant FBI committed an invasion of privacy through intrusion upon seclusion or even "false light" by racially profiling the plaintiff as an Arab, Middle Easterner, or Muslim around 2001 when the plaintiff is a Catholic, African-American from the Washington, D.C. area. Furthermore, it would also be an invasion of privacy through intrusion upon seclusion or "false light" to subject the plaintiff to counterintelligence or COINTELPRO or get a FISA warrant simply because the plaintiff had a Cuban fiance in 1999 named Rachel Garcia or to consider the plaintiff to be a "person of interest" in the same investigation involving Steven Hatfill's harassment lawsuit against the FBI when the plaintiff was merely an apprentice or intern at NIH/NHLBI/DHVD working under the supervision of Dr. Cynthia Dunbar and Dr. John Tisdale. The court can take judicial notice that the plaintiff does not mind or is not offended by the possible prospect of being an "intelligence subject" to at least one American intelligence agency such as CIA, DIA, NSA, or NRO. The court can also take judicial notice that the plaintiff can not prove with substantial certainty or by a preponderance of the evidence that he is in fact an "intelligence subject" as such a burden of proof and/or persuasion would be almost insurmountable whereby a scintilla of evidence would seem to be sufficient and/or clear and convincing evidence if not evidence beyond a reasonable doubt,

## XIV.) PRAYER FOR RELIEF

WHEREFORE, the plaintiff is requesting a remedy at law in the form of a

judgment in the amount of \$80,000 (eighty thousand dollars). This remedy at law

would be appropriate considering the fact that the sole defendant the FBI has

committed negligence, the intentional infliction of emotional distress (IIED), and

invasion of privacy through "intrusion upon seclusion" and "false light."

Moreover, the sole defendant FBI has committed a violation of the following

"black-letter law" provisions of federal law: 42 U.S.C. Section 1983, Title VII of

the Civil Rights Act of 1964, and the Americans with Disabilities Act of 1990

(ADA). Furthermore, the sole defendant FBI (acting on behalf of the executive

branch of the federal government and Department of Justice) has violated the

Equal Protection Clause and Due Process Clause of the Fifth and Fourteenth

Amendments to the U.S Constitution in addition to having violated the Privileges

and Immunities Clause of Article IV, Section 2, Clause 1 of the U.S. Constitution,

the Fourth Amendment rights to a "reasonable expectation of privacy" (see Katz v.

United States, supra) and perhaps invoking a broad assertion and interpretation of

the Eighth Amendment right to be free from cruel and unusual punishment. In

asserting this "prayer for relief," the plaintiff states, avers, and alleges the

following:

A.) The remedy at law in the form of a judgment in the amount of $80,000 (eighty thousand dollars) would also be appropriately considered to be punitive, compensatory, treble, actual, presumed, and special damages for the defendants' commission of negligence or negligence per se in addition to a violation of the following "black-letter law" provisions of federal law: 42 U.S.C. Section 1983, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act of 1990 (ADA).

B.) The remedy at law in the form of a judgment in the amount of $80,000 would also be considered appropriate given that it has been proved that the sole defendant the FBI has violated the plaintiff's rights with regards to the Equal Protection Clause and Due Process Clause (inherent from the Fifth and Fourteenth Amendments) and the Privileges and Immunities Clause (of Article IV, Section 2, Clause 1) in addition to the Fourth Amendment right to a reasonable expectation of privacy and perhaps the Eighth Amendment right to be free from cruel and unusual punishment.

C.) The plaintiff is also requesting the equitable remedy of an injunction or specific performance mandating that the defendant FBI have to "cease and desist" conducting surveillance and/or COINTELPRO on the plaintiff given that he is a Catholic, African-American from Washington, D.C. who was merely an intern

and/or apprentice at NIH/NHLBI/Division of Hematology (under Dr. Cynthia
Dunbar and Dr. John Tisdale) and that the plaintiff is not a Middle Easterner, Arab,
or Muslim from a foreign country such as Saudi Arabia, Qatar, Iraq, Syria, Iran,
Oman, and is certainly not involved in any crisis involving Houthis who are
involved in a conflict between Saudi Arabia and Iran and is not associated with the
Palestinian Liberation Organization (PLO) led by Mahmoud Abbas or any similar
organizations such as Hezbollah or Hamas.

D.) With regards to the plaintiff requesting the equitable remedy of an injunction or
specific performance mandating that the defendant FBI have to "cease and desist"
conducting surveillance and/or COINTELPRO on the plaintiff given that he is a
Catholic, African-American from Washington, D.C. who was merely an intern
and/or apprentice at NIH/NHLBI/Division of Hematology (under Dr. Cynthia
Dunbar and Dr. John Tisdale), the court should take judicial notice that even
though the plaintiff does not mind the possibility of being an "intelligence subject"
with at least one American intelligence agency, the whole idea that a FISA warrant
should be issued against plaintiff is preposterous given that the plaintiff no longer
has a Cuban fiance named Rachel Garcia or Magna Gargallo Perez and also
because neither Rachel Garcia nor Magna Perez are "intelligence assets" for CIA,

DIA, NSA, etc. (indicating that they are merely normal civilians who had to endure

the intense restrictions of the Cuban government of Fidel and now Raul Castro).

Respectfully submitted,

Ronald Satish Emrit

6655 38th Lane East

Sarasota, Florida 34243

(703)936-3043

einsteinrockstar@hotmail.com

einsteinrockstar2@outlook.com